# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN ROBERT EVANS,

Defendant.

Case No. 2:19-cr-00096-RFB-DJA

**ORDER**

## I. INTRODUCTION

Before the Court is Mr. Evans' Motion to Suppress [ECF No. 21]. The Court held an evidentiary hearing on this Motion. For the reasons stated below, the Court denies the Motion to Suppression.

## II. FACTUAL FINDINGS

The Court makes the following factual findings based upon consideration of all of the evidence submitted at the evidentiary hearing in this case.

At approximately 2:15 a.m. on March 4, 2019 Las Vegas Metropolitan Police officers responded to a 911 call. The 911 call was from Defendant Steven Evans' wife Crystal Jesus-Vales. She reported in the call that Evans had pointed a shotgun at her. She also informed the dispatcher that her two-year old son was in the same apartment where Evans had pointed a gun at her. At the direction of the dispatcher, she left the apartment. She left her son inside of the apartment. The Court cannot clearly determine why she did this, especially since she did not testify at the hearing.

Officers Smith and Laducer are the first officers to arrive on the scene. They see Jesus-Vales outside of the apartment and direct her to walk towards them to talk. She tells the officers that the there is a shotgun in the apartment and that this shotgun is sitting on her son's bed. She confirmed that her husband, Defendant Evans, was still inside of the apartment. She provided conflicting information about his last known location in the apartment. Officers then directed Jesus-Vales to move further away from the apartment entrance.

After other officers arrive, officers Smith and Laducer approached the front door of the apartment which was partially open. Officer Laducer yelled "Steven, Metro Police we know you are inside please come out with your hands up." Laducer repeated this statement and order multiple times for several minutes. There was no response from the apartment. Officer Laducer then yells into the apartment, "Are there any kids in there? Steven we just want to make sure you are okay." There was no response from anyone in the apartment. Officer Laducer repeatedly says at the ajar door, "Steven can you please talk to us?" No response comes. Other officers arrive on the scene. Officer Laducer called the dispatch radio operator to try to obtain a telephone number for the apartment to attempt to call inside of the apartment. Officer Smith continued to announce the officers' presence and repeatedly ask "Steven" to "just talk" to the officers. Officer Smith then yells, "Steven how is your baby? We want to make sure the baby is alright?" Still there was no response. The officers used their flashlights to attempt to view the interior of the apartment. They could not see the inside of bedrooms inside of the apartment and they could not see anyone in the apartment, but they did not have a full or complete view of the interior of the apartment. Their view was limited in detail and depth into the apartment.

Other officers, including Sergeant Theobald, arrived on the scene over the course of the initial officers' investigation into the circumstances of the domestic incident. Jesus-Vales told Theobald that Evans been holding the gun and waving the gun around when she decided to call 911. She initially told Theobald that Evans had pointed the gun towards her and then said that he pointed the gun upward. She said that Evans had not made any explicitly threatening statements while holding the gun. Sergeant Theobald then directed Jesus-Vales to remain around the corner from the front of the apartment.

When Theobald returned to the front of the door, the officers asked Theobald for permission to enter to apartment. He gave them permission to enter the apartment. The officers had been yelling at the front of the apartment for 10-15 minutes without receiving a response before finally entering the apartment. Upon entering the apartment, the officers encountered Evans in the apartment in a bed. His son was lying on the bed next to him. An assault rifle is propped against the front of the bed in plain view. Evans is arrested and the loaded rifle is taken into evidence. Officers never obtained a warrant to enter or search the apartment.

### III. LEGAL STANDARD

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (quoting United States v. U.S. District Court, 407 U.S. 297, 313 (1972)). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." Id. at 586. "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005). In terms of the exigency exception, the Ninth Circuit has explained that it "define[s] circumstances as those circumstances that would cause a reasonable person to believe that entry was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." Id. (internal citations omitted). "In addition to exigency, officers must have probable cause. Officers have probable cause for a search when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Huff v. City of Burbank, 632 F.3d 539, 545 (9th Cir. 2011) overruled on other grounds, 565 U.S. 469 (2012).

Alternately, "[t]he emergency doctrine provides that if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would have been found." Id. (internal citations omitted). The emergency doctrine has three requirements:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." Id.

**IV.     DISCUSSION**

The Court finds in this case that the warrantless entry into and search of Evans' apartment was justified under both the exigency and the emergency exceptions.

**A. Exigency**

The Court finds that the potential harm to the young boy in the apartment created an exigency that justified the police's warrantless entry into the apartment. A review of the objective facts found by this Court and known to the police supports this finding. Police on the scene had been informed that a woman had felt so threatened by her husband, Defendant Evans, that she had called 911 for police to be dispatched to her apartment. She told the dispatcher that the man had pointed a shotgun at her. She told the dispatcher that her two-year old son was in the apartment. This information was relayed to police officers driving to the scene. When arriving on the scene, the officers encountered the same woman, Ms. Crystal Jesus-Vales, who confirmed she was the caller and she told them that her husband, the Defendant Steven Evans, was still in the apartment. She told them that a gun was inside of the apartment. She told them that their son was also still in the apartment and the shotgun was in the child's room on the bed. The officers attempted to contact Evans to determine his whereabouts, the toddler's whereabouts and the safety of all inside the apartment. Evans did not respond. They attempted to see inside the apartment to find out if all were safe but could not effectively do so. Under such circumstances, the officers were justified in entering the apartment to ensure that no harm had come to the child or that the child would not harm himself with the gun in his room or that he would be injured or shot by Evans given the presence of the gun and Evans' previous threatening conduct.

The Court further finds, based on these same set of facts, that the potential dangers to the individuals inside of the apartment were imminent. There was an unsecured gun inside of the apartment where Jesus-Vales had felt threatened by Evans, where a toddler was present and where the toddler had physical access to the gun. The additional time it would have taken to obtain a warrant would have substantially extended the time to address these dangers, especially to the toddler. The fact that no harm came to anyone inside of the apartment does not alter this analysis or the Court's finding.

The Court further finds that the officers had probable cause to believe that Evans had committed the crime of assault in violation of Nevada Revised Statute Section 200.471(1)(a)(2). Under Nevada law, "assault" includes "intentionally placing another person in reasonable apprehension of immediate bodily harm." N.R.S. §200.471(1)(a)(2) (2017). The officers had received information from the dispatcher that a woman had called 911 for police assistance claiming that her husband had threatened her by pointing a shotgun at her. When the officers arrived on the scene, they found the caller, Ms. Jesus-Vales, who confirmed that she had been the one to call 911. She confirmed that Evans had been waving the gun around near her and in front of her when she called 911. She confirmed that a gun was in the apartment. She did not claim that her call to the police was inadvertent or a mistake. Based upon the totality of circumstances, the Court finds that there was probable cause to arrest Evans for the crime of assault.

The Court rejects Evans' arguments that Jesus-Vales' conflicting statements about Evans' conduct prevents a finding of probable cause. First, it is undisputed that Jesus-Vales felt sufficiently threatened by Evans, her husband, who was, at a minimum holding a gun and waving it around, that she called 911 for immediate police assistance. She never claims that she did not make the call or that it was a mistake when she called. Moreover, the Court takes note of the fact, as the Ninth Circuit has, that it is not uncommon for a victim of domestic abuse to subsequently make statements to investigating police that minimize or deny assaultive conduct by an abuser. See, e.g., United States v. Brooks, 367 F.3d 1128, 1137 (9th Cir. 2004) (discussing common occurrence of domestic violence victim-witnesses minimizing or denying offense conduct).

Additionally, the Court rejects Evans' reliance on Sergeant Theobald's radioed statement to the dispatcher that there did not appear to be an assault with a deadly weapon case. The Court is not bound by an individual officer's subjective interpretation and application of the facts to the relevant law. Rather, the Court must consider the relevant statutes in conjunction with the facts and the totality of circumstances to determine if there is "a fair probability" or "substantial chance that criminal activity took place." Id. at 1134. (internal citations omitted). Moreover, this Court need not find that there was probable cause that Evans committed the crime of assault with a deadly weapon. It need only find, which it does, that there was probable cause that Evans committed the crime of assault in violation of N.R.S. § 200.471(1)(a)(2).

For related reasons, the Court also rejects Evans' argument that there was insufficient evidence to support a finding of probable cause for a criminal assault simply because Jesus-Vales gave conflicting statements about whether Evans pointed the gun at her directly or was simply waving the gun around. Evans' argument with respect to Jesus-Vales' statements focuses on probable cause regarding the specific crime of assault with a deadly weapon. However, the Court need only find, as it has, that there was probable cause to support an arrest for assault for the relevant inquiry in this case.

**B. Emergency**

The Court further finds that the officers' entry into and search of the apartment was justified under the emergency exception. The three requirements of this exception are met in this case. First, the Court finds that the police entered the apartment based upon the objective facts to address a true emergency(s): a threat that Evans would harm the child inside of the apartment, a threat that the child might harm himself with the gun in his room, or the threat that Evans might harm himself. Second, the Court finds that the primary motivation and objective of the officers was to ascertain the welfare and safety of Evans and his son. The officers' repeated requests for Evans to confirm that everyone inside was "okay" and in good health and their attempts to ascertain the whereabouts of the child in relation to the rifle or shotgun as well as all of the other evidence heard support the Court's finding that the officers' motivation in entering the apartment was to prevent serious injury to anyone inside or to ascertain whether anyone had already been seriously injured with the rifle

or shotgun. Finally, there was a clear nexus between the area of the apartment searched and the emergency the officers sought to address. The officers had been informed that a shotgun was on the child's bed. They were confronted with an objective and legitimate emergency with regard to the potential threat of harm that the shotgun posed to the young boy and Evans. They went into the apartment and headed directly to the front of the apartment where there was a bed with the young boy sleeping on it with Evans. The rifle was propped against this same bed. The area in which the weapon was found was directly and unequivocally connected to the emergency. Based upon these facts, the Court finds an emergency justified the warrantless entry into and search of the apartment.

## V. CONCLUSION

For the reasons stated,

**IT IS HEREBY ORDERED** that the Motion to Suppress (ECF No. 21) is DENIED.

**DATED:** January 14, 2020.

							_____
							**RICHARD F. BOULWARE, II**
							**UNITED STATES DISTRICT JUDGE**